## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **ANITA HANEY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 08-2658 JAR/GLR** |
| | ) | |
| **STEVEN PRESTON, in his capacity** | ) | |
| **as Secretary of the UNITED STATES** | ) | |
| **DEPARTMENT OF HOUSING AND** | ) | |
| **URBAN DEVELOPMENT,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

### MEMORANDUM AND ORDER

Plaintiff Anita Haney filed this lawsuit against her former employer, the United States

Department of Housing and Urban Development ("HUD"), alleging she was discriminated

against on the basis of her race, age, gender and disability, as well as retaliated against and

subjected to retaliatory harassment and constructive discharge, in violation of Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Age Discrimination in

Employment Act of 1967 ("ADEA"), 29 U.S.C. § 633a *et seq.*, the Rehabilitation Act, 29 U.S.C.

§ 794a, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq*.

On March 31, 2010, the Court granted defendant's motion for partial dismissal.[1]  The Court ruled

that to the extent plaintiff's claims of discrimination and retaliation focus on defendant's action

involving her request for reasonable accommodation in January 2003 and her subsequent transfer

to the Intake Branch in February 2003, her claims have not been exhausted and the Court is

_____

[1](Doc. 24.)

without jurisdiction to hear them.  The Court dismissed Count I in its entirety and Count II, paragraphs 50 and 51a.  The Court incorporates that Order herein and relies upon it by reference in ruling on the instant motion for summary judgment.  The Court will not restate its previous findings in detail, except as necessary to explain the Court's ruling.

This matter now comes before the Court on defendant's Motion for Summary Judgment (Doc. 28) on plaintiff's remaining claims and Motion to Strike Plaintiff's Supplemental Disclosures (Doc. 36).  For the reasons explained in detail below, the Court denies defendant's motion to strike.  The Court grants defendant's motion for summary judgment with respect to plaintiff's claims of retaliation and constructive discharge, and denies defendant's motion with respect to plaintiff's claim of retaliatory harassment.  Pursuant to Fed. R. Civ. P. 56(f), the Court further permits the parties to respond to the issue of whether, on this record, summary judgment on plaintiff's claim of hostile work environment based on her disability and/or age should be granted on the grounds that plaintiff has not shown that the alleged conduct was "severe or pervasive."

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[2] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[3]  A fact is "material" if, under the applicable

---

[2]Fed. R. Civ. P. 56(c).

[3]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002).

substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is

"genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve

the issue either way."[5]

The moving party initially must show the absence of a genuine issue of material fact and

entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant that

does not bear the ultimate burden of persuasion at trial need not negate the other party's claim;

rather, the movant need simply point out to the court a lack of evidence for the other party on an

essential element of that party's claim.[7]

Once the movant has met this initial burden, the burden shifts to the nonmoving party to

"set forth specific facts showing that there is a genuine issue for trial."[8]  The nonmoving party

may not simply rest upon its pleadings to satisfy its burden.[9]  Rather, the nonmoving party must

"set forth specific facts that would be admissible in evidence in the event of trial from which a

rational trier of fact could find for the nonmovant."[10]  To accomplish this, the facts "must be

identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated

---

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

[6]*Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[7]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler,* 144 F.3d at 671).

[8]*Anderson*, 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[9]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[10]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197-98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 671).

therein."[11]  Rule 56(e) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.[12]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[13]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[14]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[15]

## II.     Evidentiary Objections

### A.     Motion to Strike

Defendant moves to strike plaintiff's Supplemental Disclosures as untimely, specifically plaintiff's disclosure of "Floyd May" as a witness with regard to trial and with regard to her response to defendant's motion for summary judgment.  Plaintiff has not responded, and her time for doing so has expired.[16]  Under D. Kan. Rule 7.4,

---

[11]*Adams*, 233 F.3d at 1246.

[12]Fed. R. Civ. P. 56(e).

[13]*Id.*; *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[14]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[15]*Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988).

[16]*See* D. Kan. R. 6.1(d)(1) (requiring a response to a non-dispositive motion to be filed within fourteen days).

> Absent a showing of excusable neglect, a party or attorney who fails to file a responsive brief or memorandum within the time specified in D. Kan. Rule 6.1(d) waives the right to later file such brief or memorandum. If a responsive brief or memorandum is not filed within the Rule 6.1(d) time requirements, the court will consider and decide the motion as an uncontested motion. Ordinarily, the court will grant the motion without further notice.

As a result of plaintiff's failure to timely respond, the Court grants defendant's motion with little further consideration. In so ruling, the Court notes that it has thoroughly reviewed her response submissions and finds no reference to "Floyd May." Both parties include references to and testimony from "Anthony May," prompting the Court to question whether plaintiff's untimely disclosure simply identified Mr. May by the wrong name. Accordingly, defendant's motion is granted to the extent "Floyd May" and "Anthony May" are not the same witness.

## B.    Evidentiary Issues

Defendant argues that several documents filed in support of plaintiff's summary judgment response are not properly authenticated, or lack foundation or showing of relevancy by a witness competent to testify as to their content, and are therefore inadmissible.

> Unauthenticated documents, once challenged, cannot be considered by a court in determining a summary judgment motion. In order for documents not yet part of the court record to be considered by a court in support of or in opposition to a summary judgment motion they must meet a two-prong test: (1) the document must be attached to and authenticated by an affidavit which conforms to rule 56(e); and (2) the affiant must be a competent witness through whom the document can be received into evidence . . . . Documentary evidence for which a proper foundation has not been laid cannot support a summary judgment motion, even if the documents in question are highly probative of a

central and essential issue in the case.[17]

Defendant makes a sweeping objection to twelve documents attached to plaintiff's summary judgment response as Exhibits 8, 9, 14, 15, 18, 20, 21, 25, 26, 27, 28, 29, 30 and 33. These documents include three of plaintiff's performance appraisals,[18] a leave request form from plaintiff's Employee Assistance counselor,[19] a letter from plaintiff's doctor to plaintiff's supervisor,[20] five emails/email logs,[21] a copy of 5 C.F.R. § 339.104,[22] a facsimile from plaintiff's doctor to plaintiff's supervisor, a memo from defendant's Human Resource Department attached as Exhibit G to plaintiff's deposition,[23] and plaintiff's EEO appeal record Exhibit 1.[24]  A party may properly authenticate a document "through a supporting affidavit or deposition excerpt from anyone with personal knowledge of the facts contained in the exhibit."[25]  An exhibit may also qualify as "self-authenticated" under Fed. R. Civ. P. 902.  To the extent plaintiff does not submit an affidavit or other authentication for Exhibits 9, 20, 21, 25 29 or 30, the Court sustains defendant's objection, and does not consider these documents.  Exhibits 8, 14, 15, 26 and 28 and

---

[17]*Bell v. City of Topeka,* Kan., 496 F. Supp. 2d 1182, 1184-85 n.11 (D. Kan. 2007) (citing In *re Harris*, 209 B.R. 990, 996 (B.A.P. 10th Cir. 1997) (quoting 11 James Wm. Moore, et al., Moore's Federal Practice §§ 56.10[4][c][i], 56.14[2][c] (3d ed. 1997)); *see also Toney v. Cuomo*, 92 F. Supp. 2d 1186, 1196 (D. Kan. 2000), *aff'd*, 221 F.3d 1353 (10th Cir. 2000).

[18]Exs. 8, 20, 21.

[19]Ex. 14.

[20]Ex. 15.

[21]Exs. 9, 25, 29, 30 and 33.

[22]Ex. 18.

[23]Ex. 27.

[24]Ex. 28.

[25]*Toney*, 92 F. Supp. 2d at 1196.

33 are part of the record underlying plaintiff's EEO complaint ("ROI"). Plaintiff offers several

other unopposed exhibits that were filed as part of the ROI, as does defendant,[26] and many of the

documents in the ROI were considered in the context of defendant's motion for partial dismissal.

The Court denies defendant's objection with respect to these Exhibits, to the extent they are

material. Finally, defendant's objection to Exhibit 18 is overruled, as the C.F.R. is self-

authenticated as an official publication pursuant to Fed. R. Evid. 902(5).

### C.    Objections to Affidavits

Under Fed. R. Civ. P. 56, "[a]n ffidavit or declaration used to support or oppose a motion

must be made on personal knowledge, set out facts that would be admissible in evidence and

show that the affiant or declarant is competent to testify on the matters stated."[27] Furthermore, a

witness's testimony is only admissible if evidence supports a finding that the witness has

personal knowledge of a matter.[28] "Conclusory and self-serving affidavits are not sufficient."[29]

Plaintiff relies on her own affidavit to support various factual statements in her response

brief. Defendant argues that paragraphs 57 and 58 of plaintiff's affidavit are improper, because

the statements are hearsay and attempt to create a "sham" fact by contradicting earlier sworn

deposition testimony. Defendant states that its objection is "fully set forth in its reply to

Plaintiff's response to Defendant's SOF 101 and 111."[30] The Court has reviewed those sections,

---

[26]*See, e.g.*, plaintiff's Ex. 4, defendant's Ex. D.

[27]Fed. R. Civ. P. 56(c)(4); D. Kan. R. 56.1(d).

[28]Fed. R. Evid. 602.

[29] *Murray v. City of Sapulpa*, 45 F.3d 1417, 1422 (10th Cir. 1995) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991)); *see Johnson v. Potter*, No. 01-4182-SAC, 2004 WL 2823237, at *2 (D. Kan. Nov. 10, 2004).

[30](Doc. 47 at 5.)

which deal with objections to Exhibits other than Exhibit 5, plaintiff's affidavit. Other than a

cursory mention of paragraph 57 of plaintiff's affidavit as being inadmissible hearsay,

defendant's reply does not set forth the standards for determining whether an affidavit creates a

sham issue, much less how these paragraphs contradict plaintiff's previous sworn statements.[31]

Accordingly, the Court denies defendant's objection on these grounds. The Court agrees,

however, that paragraphs 57 and 58, which relay a conversation plaintiff had with Dr. Stanley,

are not based on plaintiff's personal knowledge, and are therefore inadmissible. The Court notes

that plaintiff submits a Declaration from Dr. Stanley on the same matter.[32]

Defendant also objects to the affidavits of coworker Charles Jean-Baptiste and

Compliance Branch supervisor Deborah Jones as lacking personal knowledge and containing

impermissible opinion. Under the personal knowledge standard set forth above, an affidavit is

inadmissible if "'the witness could not have actually perceived or observed that which he

testifies to.'"[33] Accordingly, at the summary judgment stage, "statements of mere belief" in an

affidavit must be disregarded.[34] The Court disregards any portion of these affidavits that are not

based on personal knowledge. Specifically, the Court disregards the portions of Jean-Baptiste's

affidavit that relay what plaintiff told him about events that happened at work that he admits he

did not personally observe. The Court will consider, to the extent they are material, Jean-

---

[31]*See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001) (setting forth factors for the court to consider in determining whether plaintiff's contradictory affidavit seeks to create a sham issue of fact) (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)); *Dempsey v. City of Baldwin City, Kan.*, 333 F. Supp. 2d 1055, 1059 (D. Kan. 2004).

[32](Doc. 46, Ex. 17.)

[33]*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1200 (10th Cir. 2006) (quotation omitted).

[34]*Id.*

8

Baptiste's observations that Tomlin and other supervisors were not friendly with plaintiff, that she was isolated, and that she appeared to be sad and depressed while working in the Intake Branch. With respect to Jones' affidavit, the Court disregards the portions that offer her opinions and beliefs that plaintiff's treatment constitutes harassment and would have a chilling effect on other employee's filing discrimination complaints, as she did not personally observe the treatment. The Court will consider, to the extent they are material, Jones' observations that it was not normal business practice to send someone to critique a presentation of another employee, and that when she saw plaintiff after she had been transferred to the Intake Branch, she appeared to be depressed.

## III.    Uncontroverted Facts

As a threshold matter, the Court stresses that any attempt by either party to interject discussion of the merits of plaintiff's dismissed claims that relate to her request for reasonable accommodation are improper. Although plaintiff's request for accommodation and subsequent transfer may serve as limited background information, the Court disregards any attempt to rehash or recharacterize the issues that have been dismissed for lack of jurisdiction. That said, the following facts are either uncontroverted or related in the light most favorable to plaintiff, the nonmoving party.

HUD is an agency in the executive branch of the federal government and consists of a number of offices, one of which is the Office of Fair Housing and Equal Opportunity ("FHEO"). FHEO is broken down into ten geographical regions. The Kansas City FHEO office is the main office for Region VII, and includes jurisdiction over the states of Kansas, Missouri, Iowa and Nebraska. The FHEO office in Kansas City consists of four branches: Program Compliance,

Enforcement, Fair Housing Assistance Payment Program and Intake.

During the period between January and May 2003, Deborah Jones was the supervisor of the Compliance Branch, Robert Kelly was the supervisor of the Enforcement Branch, and Jacqueline Tomlin was the supervisor of the Intake Branch.

Plaintiff began working for HUD in the Kansas City Enforcement Branch in 1989. Plaintiff's job title was a Senior Civil Rights Analyst, GS-12. While in the Enforcement Branch, plaintiff consistently received positive performance evaluations. Plaintiff's position required her to travel. In 1998, HUD granted plaintiff's request for a reasonable accommodation for a back injury. Plaintiff filed another request for accommodation on January 22, 2003. She submitted the HUD 1000 Request for Reasonable Accommodation, outlining possible ways to accommodate her, and her request was granted on April 21, 2003

On February 18, 2003, plaintiff was placed on a temporary detail to the Intake Branch. Plaintiff's detail was for a period of 120 days, to end June 17, 2003. Jacqueline Tomlin, a black female, age 55 as of May 2004, who had previously filed her own EEO lawsuit, became plaintiff's immediate supervisor when plaintiff began work in the Intake Branch. When plaintiff joined the Intake Branch, the staff included Curtis Jackson (black male, age 49), Anthony May (black male, age 49), Theresa Williams (black female, age 51), Natasha Watson (black female, age 41), and Pamela Kosuth (white female, age 51). The staff in the Enforcement Branch and the Intake Branch are all civil rights analysts with the same pay grade and structure. The Intake Branch position does not require travel.

In a February 25, 2003 email, Tomlin advised plaintiff that as part of her training in the Intake Branch, coworker Jackson would work with her in processing cases. The email states:

Anita,

I have given you three cases for processing, . . . Please see Curtis so that he can train you on how we process complaints. You should work with him, step by step, until you have mastered the procedure. Please refer to your Intake/Assessment Branch Notebook for assistance and reference, as well. I am also assigning you FHAP Agencies that you will become the rep for in dual filing cases. . . . Please work with Curtis, who will train you on the process for filing dual cases. He will work with you step by step. Again, please make use of your Intake Notebook, which also has instructions on how to dual file cases. For the next two weeks, please adjust your schedule to train with Curtis from 9:30 a.m. to 11:30 a.m. daily. He will work with you on processing all cases assigned to you and on dual filing cases from your assigned FHAP agencies. . . . From 1:30 p.m. to 3:30 p.m., please work with the Intake Assessor who has the primary responsibility for Intake on that day. I want you to listen to the way that calls are taken and then as you get comfortable, begin to take calls that come in while the Assessor oversees your training. When you take calls during this period, please make sure that you identify yourself, let the caller know that you are on the speaker phone with another staff member and that you are in training. I know that you will do well on interviewing potential complaints because of your excellent investigative skills and your knowledge of the Fair Housing Act. I have advised the staff that you will be working with them. I am also copying them on this memo, so that my instructions are clear. I will be monitoring your progress, so if there are questions, please do not hesitate to contact me. It is a pleasure to have you on my staff.

Jackie

Plaintiff testified in her deposition that she had taken complaints while working in the Enforcement Branch, but did not see any reason to tell Tomlin that she had because Tomlin was "well aware" that it was one of the duties for employees out in the field. Plaintiff testified that prior to coming to the Intake Branch, she had never converted an inquiry into a complaint or generated initial letters from the Title Eight Automated Paperless Office Tracking System" ("TEAPOTS"), the computer system used for the processing of a fair housing complaint.

Plaintiff testified that she found portions of Tomlin's email to be harassing, specifically, the sentences directing plaintiff "to listen to the way that calls are taken," and directing her to identify herself as in training when taking calls during this period. Plaintiff testified that she considered it harassment for Jackson to train her. Plaintiff testified that she did not think any Intake Staff member, other than Tomlin, was qualified to train her. Two of the employees in the Intake Branch held the grade of GS-12, as did plaintiff.

Tomlin avers that her decision to have Jackson and other Intake Staff members assist in training plaintiff was not done to harass or embarrass her, and that each staff member was skilled in processing discrimination complaints and capable of training plaintiff in that process. Tomlin further avers that it is common practice to delegate authority to an employee to "supervise" other employees who are the same grade from time to time during the permanent supervisor's brief absences, as when Jackson supervised plaintiff.

Tomlin asked plaintiff to combine the PowerPoint presentation on predatory lending that plaintiff had created with slides from Tomlin's own PowerPoint presentation. During a staff meeting, Tomlin asked plaintiff to give her a photocopy of what she had done. Plaintiff provided the copy, but no slides, to Tomlin, who commented in the presence of other staff members that "it lacked substance." Plaintiff testified that she thought Tomlin's criticism of the documents was subjective, and avers that she thought it was intended to harass and intimidate her.

While in the Intake Branch, plaintiff made two public presentations on fair housing with predatory lending as the sub-topic. The first presentation was at a church; the second presentation was at a community center at Indian Springs Shopping Center ("Indian Springs"), with an "all Hispanic-speaking audience." Plaintiff alleges that after the Indian Springs

presentation, Tomlin came up to her and began to question her in a harassing manner. Tomlin avers that she advised plaintiff, outside the group setting, that her PowerPoint presentation had technical errors and was lacking in substance. Although plaintiff did not see Tomlin during her presentation, Tomlin avers that she observed plaintiff's Indian Springs presentation and that she has observed the public presentations made by other Intake Staff from time to time. Tomlin followed up her comments with a memo to plaintiff dated March 24, 2003, summarizing plaintiff's presentation and detailing the things plaintiff failed to do in her presentation and what she should do to improve it. Tomlin states in the memo that plaintiff failed to follow her previous instructions and integrate Tomlin's predatory lending information with plaintiff's.

Stella Alejos, who works in the Regional Director's Office, also made a presentation at Indian Springs. She avers that during her presentation, she noticed Tomlin in the audience, which she thought was unusual as she has never had a supervisor come and observe her presentation before. Alejos noted that she assumed Tomlin was there to observe plaintiff, because she was plaintiff's supervisor, not Alejos'. Alejos recalls that Tomlin came up to her and plaintiff after the presentation, but could not recall what was said.

Deborah Jones avers that in her experience as a supervisor for HUD, it would not be a normal practice to send someone to critique a presentation of another employee. She also avers that she has known plaintiff for many years and when she saw plaintiff after she was transferred to the Intake Branch, she was shocked by plaintiff's appearance and that she appeared to be depressed.

Anthony May began his employment at HUD in 1993, and as of May 2007, was the Intake Chief at the Kansas City FHEO. May also worked at the Enforcement Branch prior to

coming to the Intake Branch, although he did not directly transfer between branches. All employees in FHEO have the same grade level. When May was assigned to the Intake Branch in 2003, it was not his decision to transfer. At the time, he was a grade GS-12, Step 10. While in the Intake Branch, May was trained by coworkers Pam Kosuth (Grade 11), Theresa Williams (Grade 11, or new Grade 12, Step 1), Curtis Jackson and Andrea Carver (lower than Grade 9). May's training continued for over two months. May testified that he was not offended that lower graded coworkers trained him because they have the knowledge on Intake procedures and that was the job he was required to do. May made approximately fifteen presentations while working in the Enforcement Branch. After he came to the Intake Branch, May made public presentations that were observed by Jackson and Tomlin. May testified that he was not offended that his presentations were observed by Jackson and Tomlin, who also observed the presentations of other Intake Staff. Tomlin also asked Intake Staff to conduct internal presentations in the office. May gave approximately six internal presentations, which Tomlin commented on in front of other employees. May testified that he was not offended by Tomlin's comments, which included a critique on things he was doing wrong. May also testified that it was customary for Tomlin to request a copy of the employee's PowerPoint presentation before that employee made a public presentation. May testified that Tomlin asked him to review the materials for plaintiff's presentation on predatory lending and described the quality of the materials used as "garbage." May testified that he knew plaintiff had good presentation slides, because he and others had borrowed her materials when she worked in the Enforcement Branch. This time, however, he testified the slides presented to Tomlin were not what he was accustomed to.

Theresa Williams worked at the FHEO Intake Branch from 2001 to 2005. Williams

testified that she thought Tomlin was fair and made sure that everyone knew what to do and understood all instructions. Williams testified that she was glad that Jackson and Tomlin observed her public presentations. Williams also gave internal presentations, and was not offended by Tomlin's comments. Williams testified that she trained other Intake Staff, including Kosuth, May and Carson.

Curtis Jackson worked in the Intake Branch from 1995-2004, then went to work in the Enforcement Branch in 2005. Jackson testified that he thought Tomlin was a fair supervisor. Although he had previous investigative experience, Jackson testified that he was not offended by the training he received in the Intake Branch. Jackson made presentations and assisted others and observed their presentations. Jackson testified that Tomlin observed presentations. He testified that internal presentations were done and he was given feedback by Tomlin. When Jackson received a critique from Tomlin, he responded by working on his presentation to make it better.

Natasha Watson has worked in both the Intake and Enforcement Branches at HUD. Watson testified that she had experience in investigation when she came to the Intake Branch, and still received training. She testified that she was not offended to receive training, and that it took her several months to get comfortable with her duties in the Intake Branch. A trainer sat with Watson when she answered the phone and helped her take the complaint and work through the computer screens.

Tomlin avers that she did not single plaintiff out for closer supervision during her training than that given to other new employees who came to the Intake Branch, including those who transferred from the Enforcement Branch. Tomlin avers that she provided the same type of

critiques to plaintiff's slide presentation and public presentation that she did to other new employees.

From February 18, 2003 through March 23, 2003, plaintiff submitted approximately nine requests for annual or sick leave, which Tomlin granted. On March 19, 2003, plaintiff sought the assistance of EAP counselor Marry Brooks, who determined plaintiff needed to take leave for stress and anxiety. On March 21, 2003, Brooks wrote a leave request for plaintiff to be off work from March 25 through April 14, 2003, which accompanied plaintiff's request for leave without pay ("LWOP") for that period of time. Plaintiff sought treatment from her medical doctor, Dr. Rita Stanley, for anxiety and depression. On March 27, 2003, Dr. Stanley wrote a leave request for plaintiff to be off work from March 27 through April 30, 2003.

On March 25, 2003, plaintiff signed retirement papers, and sometime thereafter submitted them to the Employee Service Center in Chicago. From March 25, 2003, through April 30, 2003, management at the Kansas City FHEO was unaware that plaintiff had filled out retirement paperwork. Marsha Lowe, a Human Resources Specialist for HUD, learned that plaintiff intended to retire when plaintiff appeared in Lowe's office on May 1, 2003, and requested a clearance form to retire that day. Lowe provided the form, along with a separation packet of materials. Lowe later learned that plaintiff's retirement papers were signed March 25, 2003. Approval of plaintiff's request for LWOP is done at management's discretion; in the event of extended absence, "administratively acceptable" medical documentation is required in order for management to make an informed decision. Tomlin had questions about the medical documentation provided by plaintiff's medical providers and about the actual length of time plaintiff would be absent. Plaintiff testified that she does not know what medical documents or

information were actually received by Tomlin. Tomlin sent plaintiff five memos, dated March 31, April 9, 14, 22 and 30, 2003, respectively ("the Five Memos"). The March 31 memo requested specific medical information from plaintiff's doctor, to be provided by April 7, 2003. Tomlin also referred to a statement provided by EAP counselor Brooks and incorrectly stated that Brooks' statement was dated March 19, 2003; the correct date was March 21, 2003. Tomlin stated that plaintiff had not informed her that she had sought counseling or needed to request LWOP, was confused by the time frames and needed clarification. Plaintiff testified that she considered this memo to be harassment; Tomlin avers that her mistake was unintentional error.

Dr. Stanley attests that she responded to Tomlin's request for medical information in a detailed letter dated April 7, 2003, outlining plaintiff's diagnosis, treatment and prognosis for depression. Dr. Stanley recommended a tentative return date of April 30, 2010.

Tomlin's April 9 memo stated that previous medical documentation provided was general in nature and failed to explain how the work environment caused plaintiff to be ill and why she could not return to work after more than six weeks of medication. Tomlin stated that plaintiff's absence was having a detrimental impact on the office and placing a burden on coworkers. Tomlin set out specific questions to be answered by plaintiff's medical providers, including the current status of her diagnosis, how the condition was related to her work, an estimate of the expected date of full or partial recovery, and a statement as to what in the work environment contributed to plaintiff's condition. The memo also stated that plaintiff's LWOP was approved through April 11, 2003, and that plaintiff was to return to work on April 14, 2003. Tomlin also contacted Dr. Stanley by telephone. Plaintiff testified that she left Tomlin's April 9 memo at Dr. Stanley's office and told her it contained additional medical questions.

17

Plaintiff did not return to work on April 14, prompting Tomlin to send the third memo. The April 14 memo had the subject line, "Return to Duty Order," and advised plaintiff that she had been placed on absence without leave ("AWOL"). Tomlin stated that the April 9 memo had informed plaintiff that the medical information provided was not administratively acceptable and that she was ordered to return to work April 14. Tomlin stated that she expected plaintiff to return to work without further delay. Plaintiff testified that she chose to follow doctor's orders instead of returning to work, and that she was not subjected to any discipline for her absence on April 14.

Tomlin sent the fourth memo on April 22, 2003. Tomlin again requested that adequate medical documentation be provided, but gave plaintiff the option of submitting the information after returning to work. Tomlin also advised plaintiff that without acceptable information, work-related decisions, including possible disciplinary actions, would be made based on the information available to her.

A fifth memo was sent on April 30, requesting the results of plaintiff's medical progress. The next day, plaintiff appeared at the FHEO and retired.

Tomlin asked for, received and followed the advice from Human Resource Specialist Lowe in requesting medical documentation regarding plaintiff's request for LWOP and placing plaintiff on AWOL status.

Plaintiff filed an informal EEO Complaint on February 24, 2003. On February 26, 2003, plaintiff filed a grievance alleging retaliation for exercising her right to request a reasonable accommodation for her disability. She met with management regarding her grievance on March 12, 2003, and withdrew/abandoned the grievance on March 20, 2003. Plaintiff filed a formal

EEO complaint of discrimination on April 4, 2003, which was amended by letter dated April 9, 2003, to include claims of harassment and retaliation, then again on June 12, 2003, to include retaliatory harassment and constructive discharge.

## IV. Discussion

Plaintiff alleges four claims: retaliation, retaliatory harassment, constructive discharge and hostile work environment based on her disability and/or age. The Court discusses each in turn.

### A. Retaliation

Title VII forbids employers from discriminating against an employee for opposing an employment practice made unlawful by Title VII.[35] To establish a prima facie case of retaliation, plaintiff must show that (1) she engaged in protected opposition to discrimination; (2) she suffered materially adverse action contemporaneously with or subsequent to such activity; and (3) a causal connection existed between the protected activity and the materially adverse action.[36] If plaintiff establishes a prima facie case, defendant has the burden to articulate a legitimate, nondiscriminatory reason for the adverse action.[37] If the employer does so, the burden shifts back to the plaintiff to show that "the reason given by the employer is mere pretext for the real, discriminatory reason for the adverse action."[38]

### 1. Prima Facie Case

---

[35]*Pinkerton v. Colo. Dep't. of Transp.*, 563 F.3d 1052, 1054 (10th Cir. 2009).

[36]*See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006).

[37]*Pinkerton*, 563 F.3d at 1064.

[38]*Id.*

Defendant does not challenge the first element, that plaintiff engaged in protected opposition to discrimination when she filed a union grievance, followed by an EEO complaint, in February 2003. Defendant argues that plaintiff did not suffer adverse employment action and that no causal nexus exists between defendant's actions and plaintiff's protected action.

### *Materially Adverse Action*

Unlike in disparate treatment cases, a materially adverse action for purposes of a retaliation claim need not affect the employee's terms and conditions of employment; rather, plaintiff must demonstrate that a reasonable employee would have found the challenged action materially adverse, that is, that it might have dissuaded a reasonable worker from making or supporting a charge of discrimination.[39] The standard focuses on the employer's retaliatory action, not the underlying discrimination opposed by the employee.[40] The standard, while sensitive to the particular circumstances of each case, is an objective inquiry that turns not on plaintiff's personal feelings but on the perspective of a reasonable person in plaintiff's position, considering all the circumstances.[41] In this case-by-case approach, the court asks whether the record contains objective evidence of material disadvantage or merely the bald personal preferences of plaintiff.[42] In approaching the question of whether an employer's actions were materially adverse, the Tenth Circuit recently explained,

> [W]e are obligated to bear in mind that "Title VII protects
> individuals 'not from all retaliation' but only from retaliation 'that

---

[39]*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006).

[40]*Semsroth v. City of Wichita*, 555 F.3d 1182, 1184 (10th Cir. 2009).

[41]*Id.*

[42]*Id.* at 1185.

produces an injury or harm'" that itself rises to a "'level of seriousness.'" *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1087 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006)). To qualify under this standard, we held in *Williams* that a plaintiff must show "a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* (quoting *White*, 548 U.S. at 68) (internal quotation marks omitted). "Requiring this level of adversity . . . is necessary 'to separate significant from trivial harms.'" *id.* (quoting *White*, 548 U.S. at 68), "petty slights, minor annoyances, and simple lack of good manners," *White*, 548 U.S. at 68. "Otherwise, minor or even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1279 (10th Cir. 2005) (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996)).[43]

Plaintiff claims that in retaliation for filing her complaint of discrimination, defendant subjected her to a series of adverse actions: Tomlin criticized her work in the presence of her coworkers; she was alienated and isolated in her work environment; staff members with less experience and seniority monitored and critiqued her work; Tomlin spoke harshly to plaintiff at the Indian Springs presentation and lied about being present at the presentation; in the Five Memos, Tomlin misstated and misconstrued her medical report accompanying her request for LWOP, threatened her with disciplinary action and placed her on AWOL status; and defendant rejected her requests for LWOP benefits. Defendant characterizes plaintiff's allegations as trivial, that she was treated the same way as her coworkers with respect to training, critiquing and providing medical information to justify absence from work, and that a reasonable employee would not find defendant's actions to be adverse.

---

[43]*Johnson v. Weld County, Colo.*, 594 F.3d 1202, 1216 (10th Cir. 2010).

Although defendant moves for summary judgment on each of plaintiff's discrete claims of retaliation, plaintiff does not respond in kind, instead arguing that her claims of retaliation must be considered under the totality of the circumstances and on a cumulative basis. While the Court agrees that the totality of the circumstances must be considered in determining whether an adverse employment action has occurred, it disagrees with the parties that this results in analyzing her claims in the aggregate. Plaintiff alleges two separate claims: a discrete retaliation claim and a retaliatory harassment claim.[44] A retaliation claim requires the Court to evaluate plaintiff's discrete claims of retaliation, and consider only those retaliatory acts alleged in plaintiff's administrative charges and, among those acts, only those acts addressed by plaintiff in her summary judgment briefing.[45] By contrast, a retaliatory harassment claim necessarily alleges a pattern of ongoing activity indicative of a hostile work environment, which must be considered in the aggregate.[46] Plaintiff's response indicates to the Court that her claim is limited to retaliatory harassment, as she does not discuss the individual merits of any discrete claims of retaliation; instead, plaintiff takes issue with defendant's breakdown of plaintiff's claims into five discrete events, as they were "not singular, isolated, trivial events."[47] Moreover, plaintiff describes her supervisor's behavior as increasingly hostile, which continued and escalated after she requested LWOP, and alleges a pattern of ongoing activity indicative of a hostile work environment. Plaintiff further argues that the cumulative conduct that she was subjected to was

---

[44]Pretrial Order, Doc. 31 at 11-12.

[45]*Jones v. UPS, Inc.*, 502 F.3d 1176, 1186 (10th Cir. 2007) (each discrete incident of alleged retaliation constitutes its own "unlawful employment practice" for which administrative remedies must be exhausted).

[46]*Turrentine v. UPS, Inc.*, 645 F. Supp. 2d 976, 986 (D. Kan. 2009).

[47](Doc. 46 at 70.)

sufficiently severe that a reasonable employee might have been dissuaded from filing a discrimination complaint. Plaintiff stresses throughout her response that, while any particular discrete act may not be adverse in isolation, when combined with other conduct may be sufficiently adverse.

In light of plaintiff's response, the Court must agree that none of plaintiff's discrete claims of retaliation, standing alone, are sufficient to dissuade a reasonable worker from pursuing a charge of discrimination. No reasonable jury could conclude, based on the record evidence, that these actions constitute materially adverse actions for purposes of plaintiff's retaliation claim. Accordingly, summary judgment is granted with respect to plaintiff's retaliation claim.

**B.     Retaliatory Harassment**

**1.     Prima Facie Case**

In order to establish a prima facie case of retaliatory harassment, plaintiff must show that (1) she engaged in protected opposition to discrimination; (2) defendant subjected her to conduct that might well have dissuaded a reasonable employee from making a charge of discrimination; and (3) a causal nexus exists between plaintiff's opposition and defendant's conduct.[48]

---

[48]*Turrentine*, 645 F. Supp. 2d at 986 (D. Kan. 2009).

### *Materially Adverse Action*

As previously discussed, plaintiff cites a series of escalating hostile events that she argues establish a materially adverse action: she was alienated and isolated in her work environment; Tomlin criticized her presentation in the presence of coworkers; staff members with less experience and seniority trained her and monitored her work; Tomlin harshly criticized plaintiff at the Indian Springs presentation; the Five Memos sent by Tomlin misstated and misconstrued plaintiff's medical report accompanying her request for LWOP and threatened her with disciplinary action when she was placed on AWOL status; and she was denied LWOP status.

The parties disagree as to the standard for retaliatory harassment claims in the wake of *Burlington N. Santa Fe Ry. Co. v. White*.[49]  Defendant contends that retaliatory harassment requires a showing of harassment that was severe or pervasive enough to create a hostile work environment under Title VII.   Plaintiff argues that post-*Burlington*, a plaintiff claiming retaliatory harassment need not establish harassment that is severe or pervasive but need only show conduct that, taken together, might dissuade a reasonable person from pursuing a charge. Although this appears to be an open question in the Tenth Circuit, Judge Lungstrum has followed the latter approach in adopting elements of a retaliatory harassment claim that did not include a severe or pervasive requirement.[50]  The Court joins Judge Lungstrum in adopting this post-*Burlington* approach to retaliatory harassment claims.

---

[49]548 U.S. 53 (2006).

[50]*Id.* (citing *Seybert v. Int'l Group, Inc.*, No. 07-3333, 2009 WL 722291, at *20 (E.D. Pa. Mar. 17, 2009); *see generally Moore v. City of Phila.*, 461 F.3d 331, 340-41 (3d Cir. 2006) (noting the Supreme Court in *Burlington* "disagreed" with the severe and pervasive formulation).

The Court agrees with defendant that many of plaintiff's allegations actually stem from her complaints with respect to her request for accommodation and transfer to the Intake Branch, which she characterizes as a less prestigious and desirable position. Those claims have been dismissed, however, limiting plaintiff's claim of retaliatory harassment to events that occurred after she was transferred to the Intake Branch. A reasonable jury could find that plaintiff's complaints of harassment stem from her displeasure at being transferred to the Intake Branch. Nevertheless, viewing the evidence in the light most favorable to plaintiff, a reasonable jury could also conclude that plaintiff's laundry list of allegedly retaliatory acts, when considered in the aggregate, rise to the level of a materially adverse action.

### Causal Connection

Defendant does not identify the legal standard nor offer any legal analysis other than to state that no causation exists because Tomlin treated all of her employees the same. The Tenth Circuit has held that "[t]he causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."[51] However, "unless the [adverse action] is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation."[52] The court has held that a "six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month

---

[51]*Miller v. Auto Club of N.M., Inc.*, 420 F.3d 1098, 1121 (10th Cir. 2005) (quoting *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir. 1982)), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53 (2006).

[52]*Id.* (quoting *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004)).

period, standing alone, is insufficient."[53]

Here, the alleged adverse action began the day after plaintiff's initial complaints about discrimination, when Tomlin sent plaintiff a memo about training that plaintiff considered to be harassment, and continued to escalate after plaintiff requested LWOP, until she retired. This evidence is sufficient to permit a reasonable jury to find the requisite causal connection between plaintiff's protected activity and the alleged harassment.

## 2.      Pretext

Defendant contends that it had legitimate, non-discriminatory reasons for all the decisions it made concerning plaintiff's employment in the Intake Branch. Specifically, defendant argues that all new employees are provided with the same training when they joined the Intake Branch; plaintiff received the same supervision from Tomlin as other employees did because Tomlin wanted to help improve their performance; and Tomlin acted properly in requesting medical documentation in support of plaintiff's request for LWOP and placing her on AWOL status.   Because defendant has articulated a legitimate, nondiscriminatory reason for its actions, the burden shifts to plaintiff to present evidence from which a reasonable jury might conclude that defendant's proffered reason is pretextual or "unworthy of belief."[54]

A plaintiff can show pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence."[55]

---

[53]*Meiners*, 359 F.3d at 1231.

[54]*See Pippin v. Burlington Res. Oil & Gas Co.*, 440 F.3d 1186, 1193 (10th Cir. 2006).

[55]*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quotations omitted).

While this burden is not onerous . . . it is also not empty or perfunctory."[56]  A plaintiff typically makes a showing of pretext in one of three ways: (1) evidence that defendant's stated reason for the adverse employment action was false, *i.e.* unworthy of belief; (2) evidence that defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting plaintiff.[57]  "Mere conjecture that the employer's explanation is pretext is insufficient to defeat summary judgment."[58]

As evidence of pretext, plaintiff contends that she went from an outstanding employee in Enforcement Branch to one who was accused of not producing work exemplary of her status. Plaintiff claims that she was singled out and Tomlin's criticism of her was overly harsh; although plaintiff's coworkers say they were not offended by Tomlin's treatment, defendant does not offer any details regarding the critiques they received.  Plaintiff proffers that observations of presentations were not done as a matter of course.  Several of plaintiff's coworkers noticed a marked change in her demeanor after the transfer to the Intake Branch, and that she was distressed and depressed.  And, plaintiff has proffered that Tomlin received detailed medical information from Dr. Stanley, but continued to question it and request more documentation.

Plaintiff's evidence of retaliatory animus is not overwhelmingly strong, but neither are the supposedly non-retaliatory reasons offered by defendant for Tomlin's treatment of plaintiff.

---

[56]*Id.* at 1323-24.

[57]*Kendrick v. Penske Transp. Servs, Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

[58]*Myers v. Colgate-Palmolive Co.*, 102 F. Supp. 2d 1208, 1217 (D. Kan. 2000) (citing *Hilti, Inc.*, 108 F. 3d at 1323).

Moreover, the Tenth Circuit has instructed that a plaintiff need not present sufficient evidence to reject each of the employer's multiple reasons for its adverse employment action if a plaintiff casts "substantial doubt" on many of them such that the jury could reasonably find that the employer lacks credibility.[59] On balance, plaintiff has proffered evidence sufficient to convince a jury that defendant's non-retaliatory reasons for Tomlin's harassment are pretextual and that her treatment of plaintiff was motivated by retaliatory animus. Such a finding is particularly appropriate in a case alleging harassment, as segmenting facts and reasons robs the incidents of their cumulative effect.[60] Accordingly, summary judgment is denied on plaintiff's retaliatory harassment claim.

### C. Constructive Discharge

Defendant contends that summary judgment is warranted on this claim because plaintiff was not constructively discharged from her position, but instead, voluntarily retired. An employee is constructively discharged "when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit."[61] The court evaluates the voluntariness of an employee's resignation under an objective, totality of the circumstances standard.[62] The constructive discharge bar is "quite high."[63] The question is not whether plaintiff's working conditions were difficult or

---

[59]*Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 812-14 (10th Cir. 2000).

[60]*See McGowan v. All Star Maint., Inc.*, 273 F.3d 917, 921 (10th Cir. 2001) (discussing claim of racial harassment in the workplace).

[61]*MacKenzie v. City & County of Denver*, 414 F.3d 1266, 1281 (10th Cir. 2005).

[62]*Id.*

[63]*Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1221 (10th Cir. 2002).

unpleasant.[64] Instead, plaintiff must show that she had no other choice but to quit.[65]  In evaluating whether the employee's working conditions would cause such a feeling in a reasonable person, the court applies an objective test under which neither the employee's subjective views of the situation, nor the employer's subjective intent, are relevant.[66]

Plaintiff alleges that because of Tomlin's harassment, she was forced to take leave because of her stressful work environment.  She argues that she was faced with the choice of returning to the work environment that caused her depression, or retiring.  Because her health was the only reasonable choice, she claims she was constructively discharged.

The Court disagrees.  On this record, a reasonable person would not find that plaintiff has shown under an objective standard that defendant allowed her working conditions to become so intolerable that she had no other choice but to quit.  The fact that a plaintiff subjectively considers his or her workplace stressful and may have suffered personal heath problems as a result is not an objective criterion used to determine if a reasonable employee would have been compelled to resign.[67]  Moreover, the record does not demonstrate that plaintiff's retirement was objectively involuntary.  Although plaintiff clearly believed that she was unfairly and harshly treated by her supervisor, the time frame in which the harassment occurred leading to plaintiff's retirement was brief.[68]  Plaintiff's attempts to explore any option short of retirement were

---

[64]*See Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004).

[65]*Garrett*, 305 F.3d at 1221.

[66]*E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 805 (10th Cir. 2007).

[67]*Exum*, 389 F.3d at 1135-36 (citing *Sanchez v. Denver Pub. Sch.,*164 F.3d 527, 534 (10th Cir. 1998)).

[68]*Yearous v. Niobrara County Mem'l Hosp. By and Through Bd. of Trustees*, 128 F.3d 1351, 1357 (10th Cir. 1997) (citing *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996)) ("An employee who quits without giving his employer a reasonable chance to work out a problem has not been constructively discharged.").

abbreviated and incomplete, and does not appear to have given defendant a reasonable chance to work out her issues and allegations. Although plaintiff filed a grievance on February 26, she withdrew it on March 20, around the time she requested LWOP. Plaintiff then filed her formal EEO complaint on April 4, 2003, alleging retaliation and harassment by Tomlin, then retired on May 1. Instead of retiring, it appears that plaintiff had several choices: she could have chosen to comply with Tomlin's request and provided the medical documentation and remained at home; she could have refused to comply and faced the possible consequences of that choice; she could have waited for her formal complaint to be processed; or, she could have waited for her temporary assignment to the Intake Branch to expire. As defendant notes, plaintiff had already filled out her retirement papers on March 25, 2003, before she received any of Tomlin's Five Memos. Although plaintiff claims she was depressed when she filled out the retirement paperwork, she was represented by counsel and selected the effective date of her retirement. Her attempt to recast her voluntary decision to retire as a constructive discharge by defendant falls short of the mark, and summary judgment is granted on this claim.

###	D.	Discriminatory Harassment

Plaintiff asserts that defendant subjected her to a hostile work environment based on her disability and/or age after she was transferred to the Intake Branch in February 2003. Plaintiff contends that since defendant did not move for summary judgment on this claim, which she claims survived this Court's Order granting defendant's motion for partial dismissal, it must proceed to trial. Defendant argues that plaintiff abandoned this claim by failing to plead it in her Complaint and waived it by failing to include it in the Pretrial Order.

The Pretrial Order entered June 28, 2010,[69] supersedes all pleadings and controls the subsequent course of the case.[70] "[T]he pretrial order is the controlling document for trial."[71] "As such, claims, issues, defenses, or theories of damages not included in the pretrial order are waived even if they appeared in the complaint and, conversely, the inclusion of a claim in the pretrial order is deemed to amend any previous pleadings which did not include that claim."[72]

Count I of the Complaint alleged discriminatory conduct arising from plaintiff's request for accommodation and subsequent transfer to the Intake Branch, and included the allegation that defendant's conduct was motivated by her disability, race, age and gender. The Court dismissed Count I in its Order granting defendant's motion for partial dismissal. Count II of the Complaint alleged a claim of retaliation, including retaliatory harassment and constructive discharge; the Court dismissed the portions of Count II that related to plaintiff's request for accommodation. The Complaint did not include a claim for disability and/or age harassment occurring after plaintiff was transferred to the Intake Branch, and plaintiff did not seek leave to amend the Complaint after the Court granted defendant's motion for partial dismissal. The Pretrial Order, however, clearly asserts a claim for "Hostile Work Environment Harassment" based upon plaintiff's disability and/or age after she was assigned to the Intake Branch.[73] When a claim appears for the first time in a pretrial order, the Tenth Circuit has counseled,

---

[69](Doc. 31.)

[70]*See* Fed. R. Civ. P. 16(e); D. Kan. Rule 16.2(c).

[71]*Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) (quoting *Expertise Inc., v. Aetna Fin. Co.*, 810 F.2d 968, 973 (10th Cir. 1987)); Fed. R. Civ. P. 16(e).

[72]*Wilson*, 303 F.3d at 1215.

[73](Doc. 31 at 7, 11.)

> it is incumbent upon opposing counsel to meticulously examine the
> order, taking exception, if necessary, to the additions,
> and recording their objection in the pretrial order.  Meanwhile, the
> party seeking to add a claim or defense should do so with
> specificity and clarity so as to minimize the ill effects of that
> practice.  Specificity and clarity provide the trial court with a fair
> opportunity to consider whether to approve or deny what is
> obviously an attempt to amend the pleadings at a rather late date.[74]

The Pretrial Order does not reflect any objection to this claim by defendant, nor does it convey that plaintiff purports to assert a new claim.  However, the Pretrial Order clearly alleges a claim for hostile work environment based on plaintiff's disability and/or age, and is thus deemed to have amended any previous pleadings.

Because defendant did not move for summary judgment on this claim, plaintiff is correct that it should proceed to trial.  Effective December 1, 2010, however, Fed. R. Civ. P. 56 was amended to permit the Court, after giving notice and a reasonable time to respond, "to consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."[75]  To succeed on such a hostile work environment claim, plaintiff must show that (1) she is a qualified individual with a disability or over the age of 40; (2) that the conduct in question was unwelcome; (3) that the harassment was based on her disability or her age; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) the facts provide a basis for imputing liability to the employer.[76]  After considering the submissions of the parties and the nature of the claim, the Court notifies the parties that it is considering summary judgment on plaintiff's hostile work environment claim on

---

[74]*Wilson*, 303 F.3d at 1216 (citing Fed. R. Civ. P. 15(a)).

[75]Fed. R. Civ. P. 56(f)(3) (2010).

[76]*See Lanman v. Johnson County, Kan.*, 393 F.3d 1151, 1156-58 (10th Cir. 2004) (ADA).

the issue of whether the harassment was sufficiently severe or pervasive to create an abusive work environment.

Although defendant did not move for summary judgment on this claim, it asserts in the context of plaintiff's retaliatory harassment claim that she cannot show that the alleged harassment was sufficiently severe or pervasive to create an abusive working environment.[77] To prevail under a hostile work environment theory, plaintiff must show that disability or age-based conduct had the purpose or effect of unreasonably interfering with her work performance or created an intimidating, hostile or offensive working environment.[78] To establish the claim, plaintiff must show both that the conduct to which she was subjected was "severe or pervasive enough to create . . . an environment to be abusive."[79] The existence of such an environment can only be determined by looking at the totality of the circumstances present in the workplace, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[80]

Plaintiff's allegations of harassment are fully set forth in the parties' submissions. Accordingly, the Court shall permit the parties to respond to the issue of whether, on this record, summary judgment on plaintiff's claim of hostile work environment based on her disability and/or age should be granted on the grounds that plaintiff has not shown that the conduct was

---

[77](Doc. 29 at 28.)

[78]*See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753 (1998).

[79]*Harris*, 510 U.S. at 21.

[80]*Id*; *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998).

33

"severe or pervasive."  Plaintiff's response shall be filed on or before **January 12, 2011; defendant's reply shall be filed on or before February 2, 2011.  Because trial is currently set for March 1, 2011, no extensions of time will be granted.**

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's Motion for Summary Judgment (Doc. 28) is granted in part and denied in part.  Summary judgment is **granted** on plaintiff's claims of retaliation and constructive discharge, and **denied** on plaintiff's claim of retaliatory harassment.

**IT IS FURTHER ORDERED** that, pursuant to Fed. R. Civ. P. 56(f), the parties may respond to the issue of whether, on this record, summary judgment on plaintiff's claim of hostile work environment based on her disability and/or age should be granted on the grounds that plaintiff has not shown that the conduct was "severe or pervasive."  Plaintiff's response shall be filed on or before **January 12, 2011; defendant's reply shall be filed on or before February 2, 2011.**

**IT IS FURTHER ORDERED** that defendant's Motion to Strike (Doc. 36) is **granted.**

**IT IS SO ORDERED.**

Dated: <u>December 22, 2010</u>

           <u>S/ Julie A. Robinson</u>
           JULIE A. ROBINSON
           UNITED STATES DISTRICT JUDGE